## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**IN RE SEARCHES OF:**

| | |
|---|---|
| **Phone #1**-Black Verizon Samsung, "Flip Style" Cellular Phone Bearing FCC ID: A3LSMB311V seized from James Lipscomb, and Currently in Possession of the FBI, Pittsburgh Office. | Magistrate No. 16-960 m |
| **Phone #2**-Black iPhone, "Touch Screen" Cellular Phone Bearing FCC ID: BCGA1303B, seized from 79 Hillcrest Drive, Pittsburgh, PA 15237, and Currently in Possession of the FBI, Pittsburgh Office. | Magistrate No. 16-961 m |
| **Phone #3**-Black and silver iPhone, "Touch Screen" Cellular Phone Bearing FCC ID: BCG-E2944A seized from 79 Hillcrest Drive, Pittsburgh, PA 15237, and Currently in Possession of the FBI, Pittsburgh Office. | Magistrate No. 16-962 m |
| **Phone #4**-Black Motorola Nextel, "Flip Style" Cellular Phone Bearing Serial #364TFG65D2, seized from 79 Hillcrest Drive, Pittsburgh, PA 15237, and Currently in Possession of the FBI, Pittsburgh Office. | Magistrate No. 16-963 m |
| **Phone #5**-Silver Samsung Cellular Phone Bearing Hex ID: A00 39A 2A5 1B seized from 79 Hillcrest Drive, Pittsburgh, PA 15237, and Currently in Possession of the FBI, Pittsburgh Office. | Magistrate No. 16-964 m |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Andrew F. Siebert, having been duly sworn, depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), United States

Department of Justice (USDOJ).  As such, I am an "investigative or law enforcement officer of the

United States" within the meaning of Title 18, United States Code (U.S.C.), Section 2510(7); that

is, an officer of the United States, who is empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, U.S.C., Section 2516.

2.    I have been employed as a Special Agent of the FBI for approximately ten months, and have been assigned as an investigative agent to the Pittsburgh Division, Greater Pittsburgh Safe Streets Gang Task Force (hereinafter, "FBI Task Force") since approximately November of 2015. From August of 2012 until March of 2013, I served as a Correctional Officer for the Federal Bureau of Prisons (BOP) in Fort Worth, Texas, and from March of 2013 until June of 2015, I served as a United States Customs and Border Protection (CBP) Officer in Charlotte, North Carolina.

3.    During my tenure with the FBI Task Force and as a federal officer, I have conducted analysis and numerous searches of electronic devices (i.e. telephones, computers, tablets, etc.), analyzed telephone and other records, interviewed subjects and witnesses, supervised activities of confidential human sources, conducted surveillance, authored multiple affidavits to include search warrants and Title III, and executed search and arrest warrants. I have also participated in numerous investigations of narcotics traffickers, violent gangs, and criminal organizations and their involvement in narcotics trafficking, firearms, and other related crimes. While being trained as a Special Agent of the FBI, your affiant received basic training at the FBI Academy located in Quantico, Virginia.

4.    Based upon the above experience, I am familiar with the *modus operandi* of persons involved in the illicit distribution of controlled substances, including heroin, as well as the terminology used by those persons to describe it. I am aware that persons involved in the illicit distribution of controlled substances routinely attempt to conceal their identities, as well as the location at which drug transactions take place. I know that it is common practice for drug

traffickers to routinely utilize multiple telephones, mobile phones, prepaid phones, calling cards, text messaging, counter surveillance, false or fictitious identities, and coded communications to their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from detection by law enforcement. Moreover, it is not abnormal for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual. I know that the individuals engaged in organized drug distribution and sales maintain extensive contact, via telephone and through other means, with persons from whom they receive drugs and with whom they distribute these drugs. It is also common practice for drug traffickers to retain these phones at their residences or other locations due to the incriminating evidence contained on them.

5.      I am currently participating in an investigation involving federal, state, and local law enforcement agencies concerning drug traffickers operating in the greater Pittsburgh area. In January of 2016, the FBI Task Force, which is comprised of agents of the FBI, Pittsburgh Bureau of Police, Allegheny County Sheriff's Office, Wilkinsburg Police, and Allegheny County Police, initiated an investigation into members and associates of a heroin drug trafficking organization led by JAMES LIPSCOMB (hereinafter as, "the LIPSCOMB DTO"). This investigation has targeted the drug trafficking activities of, in particular, JAMES LIPSCOMB, a/k/a "Slugs"; LAVARIS ANDERSON-OAKES (hereinafter, "OAKES"); MARCUS HARRIS (hereinafter, "HARRIS"); ISMAEL DELVALLE ORTIZ (hereinafter, "ORTIZ"), and other co-conspirators who are known and believed to be involved in the supply and distribution of heroin in the greater Pittsburgh area of Pennsylvania (TARGET SUBJECTS).

6.      This Affidavit concerns violations of federal criminal statutes enumerated in Title 18, United States Code, Section 2516; offenses involving violations of (together, the SUBJECT

OFFENSES):

    a.   Title 21, United States Code, Section 841(a)(1) – possession with the intent to distribute and distribution of controlled substances, namely, heroin;

    b:   Title 21, United States Code, Section 843(b) – use of a communication facility to further the commission of a felony controlled substance offense;

    c.   Title 21, United States Code, Section 846 – conspiracy to distribute and possess with the intent to distribute controlled substances, namely, heroin.

7.    There is probable cause to believe that the TARGET SUBJECTS and others as yet unknown utilized the above-captioned cellular telephones, as well as other cellular devices, during the period of investigation in furtherance of, in connection with, to facilitate, and to commit the abovementioned offenses.

8.    I have obtained the information contained in this Affidavit from my personal participation in the investigation and from reviewing information obtained from other law enforcement officers assisting in this investigation, as well as information provided by cooperating individuals.  I have also reviewed information obtained through legal process, such as telephone records, telephone communications and associated data, as well as information obtained through law enforcement and commercial databases. Since this Affidavit has been drafted for the limited purpose of providing probable cause to search the five cellular telephones recovered from LIPSCOMB and his primary residence located at 79 Hillcrest Drive, Pittsburgh, PA 15237 (hereinafter as, "primary residence") at the time of his arrest, I have not included all the facts known to me about this investigation.

**Overview**

9.    This Affidavit is made in support of an application which seeks authorization for

search warrants for five cellular telephones: Phone#1 (FCC ID: A3LSMB311V), Phone#2 (FCC ID: BCGA1303B), Phone#3 (FCC ID: BCG-E2944A), Phone#4 (SN: 364TFG65D2), and Phone#5 (HEX ID: A00 39A 2A5 1B) seized from JAMES LIPSCOMB incident to his lawful arrest and from his primary residence pursuant to a court authorized search warrant on July 6, 2016. Given the drug trafficking activities of the LIPSCOMB DTO referenced throughout this Affidavit, there is probable cause to believe that LIPSCOMB and other co-conspirators of the LIPSCOMB DTO utilized cellular telephones in furtherance of their illegal drug business. Therefore, probable cause exists that further evidence of LIPSCOMB's illegal activities will be found on these cellular telephones.  The phones have been in custody of the FBI at their Pittsburgh Field Office since the time of LIPSCOMB's arrest and execution of the federal search warrant.

   a.   **Phone #1** - Black Verizon Samsung, "Flip Style" Cellular Phone Bearing FCC ID: A3LSMB311V

   b.   **Phone #2** - Black iPhone, "Touch Screen" Cellular Phone Bearing FCC ID: BCGA1303B

   c.   **Phone #3** - Black and silver iPhone, "Touch Screen" Cellular Phone Bearing FCC ID: BCG-E2944A

   d.   **Phone #4** - Black Motorola Nextel, "Flip Style" Cellular Phone Bearing Serial #364TFG65D2

   e.   **Phone #5** - Silver Samsung Cellular Phone Bearing Hex ID: A00 39A 2A5 1B

### Facts Giving Rise to Probable Cause

   **10.**   In January 2016, members of the FBI Task Force began the utilization of various investigative methods, including but not limited to physical surveillance, confidential human sources, pole camera surveillance, pen registers and trap and trace, telephone pings, and GPS

vehicle trackers. A pole camera installed to observe LIPSCOMB's known "stash residence" located at 1135 Buente Street, Pittsburgh, PA captured multiple drug shipments throughout the investigation involving LIPSCOMB, OAKES, ORTIZ, HARRIS, other drug couriers and co-conspirators.

11.    In April 2016, members of the FBI Task Force initiated a court authorized Title III wiretap in order to intercept both wire and electronic communications between multiple cellular telephones utilized by LIPSCOMB and other members of the LIPSCOMB DTO.

**May 10-12, 2016**

12.    On May 10, 2016, at approximately 10:38 a.m., TARGET TELEPHONE 6 [412-216-2215], utilized by OAKES, made an outgoing telephone call to TARGET TELEPHONE 4 [412-719-1073], utilized by LIPSCOMB. At the time of the call, LIPSCOMB was physically in the Newark, NJ area, while OAKES was in Pittsburgh. Below is a partial transcription of the conversation between LIPSCOMB (JL) and OAKES (LO):

> **JL: Yeah, yeah, yeah, I had um, I had hit you, he only had half, so, I was just waitin and shit. And he told me last night that ah, he, he sho, he should have it in a couple hours and shit. But he never called. You know what I'm sayin? He ain't never called me, so. He should have it now, he probably got into something. I went to the telly.**
> **LO: Mean, I mean, for real for real, like I could take that, like that's all he got, you feel me, like. I ain't got shit.**
> **JL: Aight then, alright**
> **LO: And then just let me know like if he, if he, if he ain't gonna be able to have the rest of it. In, in a decent amount of time, I'll just take the half**
> **JL: Okay, now listen to this. Now ah, do you have ah, ah, ah, um. Matter of fact, you still could go to that same spot. Naw, you can't. You have somewhere where my ah, my homie could just come right there to you**
> **LO: Depends what time of the day you talking about**
> **JL: Early in the morning**

LO: Um, yeah.  I got to think about that for a first.  Only thing is more...

JL: Yeah but this, this is what you gonna do, because...

LO: Alright, I'm listening

JL: He don't, once he get to Pittsburgh, he's not gonna drive, he's, he's gonna catch a, not an Uber, he's gonna get in a Yellow Cab because, or one of them cabs cause you know police don't fuck with that.  You know what I'm sayin

LO: Right

JL: So, that's what he gonna do, you gotta give him an address.  And he'll park the car, you know what I'm sayin, what he usually in, then just, you know, catch a cab or whatever.  Cause he, he ain't gonna drive around

LO: Catch a cab

JL: Yeah

LO: Um...

JL: Because the ah, the UI is, you know I found a house in West View.  You know what I'm saying.  And ah, I'll go in there and ah UI

LO: Well look, tomorrow morning, look tomorrow morning

JL: Yeah

LO: Is gonna be my last day of this little orientation shit I'm in, probably just for that CDL shit.  So

JL: Aight, okay

LO: I gotta be there by nine o'clock, so...

JL: Alright

LO: If, if he's talkin bout early in the morning, like.  Like, normal early, but I'm telling you right now I can't meet him at nine o'clock though, after nine o'clock.  Matter fact, not even after eight o'clock.

JL: So you wanna wait 'til the next morning

LO: I mean, if you could make it, if he could be there like around six.

JL: Yeah, but see um, aight, aight.  I don't wanna him to get up there and get stuck, you know what I'm sayin, because, he ain't gonna be able to go to ah, Machell house.  Cause I don't fuck wit her no more, I don't stay there, I don't fuck wit her.  You know what I'm sayin

13.    At this point in the conversation, LIPSCOMB and OAKES began to have a discussion regarding LIPSCOMB's marriage to MACHELL LIPSCOMB and the potential for divorce. Shortly thereafter, LIPSCOMB and OAKES continued discussing the heroin shipment, transcribed below:

> **LO: I gotta get ready to go back to this class.  You think you'll find out tonight?  I mean, by, by five o'clock what, what dudes talking about**
>
> **JL: Yeah, okay I got you bro**
>
> **LO: But look, I'll, I'll call you, I get out, look, I get off class at four.  So I'll call you at, I'll call you like about four thirty, five o'clock, and ah, and we'll go from there you feel me**
>
> **JL: Yeah**
>
> **LO: Just let me know, just let me know if ah, if he could, if he could do the whole thing**
>
> **JL: Okay**
>
> **LO: Or, or not, you feel me.  And then we'll just go from there, I'll figure everything else out by the morning, I mean by five o'clock**
>
> **JL: Alright**
>
> **LO: Alright**
>
> **JL: Aight**
>
> **LO: Hey**
>
> **JL: Yep**
>
> **LO: Save some of them bit booty Dominicans for me too, man**
>
> **JL: Ahh, yeah man, hey man**
>
> **LO: (Laughs)**
>
> **JL: I'm enjoy, every day bro, like, it been wild man**
>
> **LO: (Laughs)**
>
> **JL: Pfff**
>
> **LO: You have the wave of women right now man**
>
> **JL: Wild episodes man**

**LO: Hey yo, did you see about that one shit I was talkin about**

**JL: That what**

**LO: That, that one shit I was talkin about**

**JL: Ahh, refresh**

**LO: That ah, that that na, ah, the shit it when I had came to get your crib, your people's had brought it with em**

**JL: Oh, I could, I could ride over there and check that shit out. I'm a ride over and check...**

**LO: Yeah yeah, check, check, yeah, yeah, yeah, find out about that for me**

**JL: Yeah, I got you**

**LO: I told you ah, ma fuckas is definitely, ya mean**

**JL: Yeah. I'm a ride over there and check it out. I gotta ride over a, ah, cross town and shit. I got you.**

**LO: Oh da, I'm a, I'm a hit you at five**

**JL: Alright, one**

**14.** I believe based on my knowledge and experience that in the above conversation OAKES and LIPSCOMB discussed LIPSCOMB arranging for heroin to be transported from Newark to OAKES in Pittsburgh. LIPSCOMB informed OAKES that his heroin source only had "**half**" of the heroin that OAKES requested, but should have the remaining amount shortly. OAKES informed LIPSCOMB that he would take half if that is all that the supply currently had, unless the supplier could get a "**whole one**". Your Affiant believes a "**whole one**" to refer to a kilogram of heroin, or approximately 1,000 bricks of heroin[1]. OAKES and LIPSCOMB discussed the courier transporting the heroin to Pittsburgh and utilizing a taxi-cab once he arrives to elude

---

[1] Heroin is typically packed in "brick" increments in the greater Pittsburgh area. A brick refers to approximately 50 "stamp bags" containing heroin. Stamp bags are small glassine bags bundled in increments of 10, which is commonly referred to as a "bundle". A brick consists of five bundles of heroin, totaling 50 stamp bags. The approximate weight of heroin contained in one brick of heroin ranges from 1-1.5 grams, making 1,000 bricks approximately one kilogram of heroin.

law enforcement detection.  Your Affiant also believes that during the conversation, OAKES inquired if the heroin would be a specific stamp, which OAKES and LIPSCOMB must have previously discussed.  LIPSCOMB informed OAKES that he would drive to the location where the heroin was and "**check it out**" to ensure that it was/was not the specific product that OAKES requested.

**15.**    Approximately 7 minutes later, at 10:45 a.m., TARGET TELEPHONE 4 [412-719-1073], utilized by LIPSCOMB, made an outgoing telephone call to TARGET TELEPHONE 7 [646-492-1454], utilized by ORTIZ, known to be LIPSCOMB's source of heroin supply.  Below is a transcription of the conversation between LIPSCOMB (JL) and ORTIZ (IO):

> **IO: Yo**
> **JL: Yo**
> **IO: What's up, bra they**
> **JL: What up**
> **IO: This ma'fucka's um, they had me on hold forever man, I just spoke to him twenty minutes ago, they say UI**
> **JL: Yeah, what he got now, what you got now**
> **IO: Five**
> **JL: That's good. I take that now, I gotta, I gotta get something.  You know what I'm sayin**
> **IO: Aight, I'm bout to get**
> **JL: UI**
> **IO: I'm bout to get up**
> **JL: Waiting on a um**
> **IO: Okay, I'm bout to jump up and um, what you want me to see bro or, or see you, where**
> **JL: Yeah call, call bro, cause them, them**
> **IO: I got you, bout to get on that right now**
> **JL: They killin me.  They, they killin my line man.  They like, man**

**IO: I'm bout to get on that right now**

**JL: Alright**

**IO: Alright**

**JL: Alright**

16.      I believe that, based on my knowledge and experience, in the above conversation LIPSCOMB contacted his heroin source of supply and asked how much heroin ORTIZ currently had.  ORTIZ informed LIPSCOMB that he had "**five**", which your Affiant believes to be five hundred bricks of heroin, and LIPSCOMB said that he would "**take that now**", believed to mean he needed the five hundred bricks of heroin for a customer, believed to be OAKES, per the previous conversation.  LIPSCOMB informed ORTIZ that "**they**", believed to mean his heroin customers continued to contact him in an effort to acquire additional heroin.  ORTIZ informed LIPSCOMB that he was going to "**get on that**" and asked if ORTIZ was supposed to contact LIPSCOMB when he was ready.  LIPSCOMB instructed the source to contact "**bro**", believed to be an associate of LIPSCOMB's assisting with the arrangements to have the heroin transported to Pittsburgh.

17.      The next day, May 11th, at approximately 2:13 p.m., a TARGET TELEPHONE 6 [412-216-2215], utilized by OAKES, made an outgoing telephone call to TARGET TELEPHONE 4 [412-719-1073], utilized by LIPSCOMB.  Below is a transcription of the conversation between LIPSCOMB (JL) and OAKES (LO):

**JL: Yo**

**LO: What up with you**

**JL: Hey what's good bro**

**LO: You got some good news for me please man**

**JL: Yeah man I'm working on it today.  I had mad phone calls yesterday but I had everything in my trunk UI all went down so everything that was value that was**

valuable to me, I put in my trunk you know what I'm saying, UI so if anything happen you know what I'm saying when my peoples come get my car everything be in my trunk you know what I'm saying. So I had yeah, I had everything in my trunk and shit UI situation and shit but um. Yeah we working on that today but ah, I'm gonna try and get that shit ASAP you heard

LO: Oh, yeah, yeah, yeah

JL: It's in my hand

LO: I mean for real for real like

JL: It's in my hand, yep

LO: UI what you say

JL: It's in my hand

LO: Alright, what the, what the half or the whole

JL: Ah you said da, ah, you wanted five right

LO: Yeah I'll take that if, it, if it's ready if it ain't ready I'll just take whatever's ready. I need something bad though

JL: Yeah, yeah it's ready. I got, I got, I got get right, I'm ah, I'm gonna get on that right now I'm leaving downtown getting on that right now for real

LO: Oh you still up the way or you out here

JL: No, no, no I'm up the way

LO: You think, you think, you think it probably be around in the morning

JL: Yeah I'm gonna try and get, I'm gonna try and get 'em out tonight. I'm gonna holler at you in the morning

LO: I need that shit bad yo, alright well let me know tonight

JL: Alright, alright, I'm on it right now buddy you got my word

LO: Good look yo

JL: Alright

18.    Your Affiant believes, based on my knowledge and experience, that in the above conversation LIPSCOMB and OAKES continued to discuss the heroin that LIPSCOMB was arranging to supply to OAKES. LIPSCOMB informed OAKES that he was "**working on it**" and

that it was in his "**hand**", which your Affiant believes to mean that LIPSCOMB had acquired the heroin and was working on the details concerning the transportation of the heroin to OAKES. OAKES asked LIPSCOMB if it was half or whole, and LIPSCOMB informed OAKES that it was "**five**", believed to be five hundred bricks of heroin (approximately ½ of a kilogram).  LIPSCOMB informed OAKES that he would attempt to have the heroin transported to the Pittsburgh area that night.

19.  That evening, at approximately 8:54 p.m., TARGET TELEPHONE 6 [412-216-2215], utilized by OAKES, made an outgoing telephone call to TARGET TELEPHONE 4 [412-719-1073], utilized by LIPSCOMB.  Below is a transcription of the conversation between OAKES (LO) and LIPSCOMB (JL) ["UI" = unintelligible]:

> **JL: Hello**
>
> **LO: Yeah, oh**
>
> **JL: Yo. Hey um, I'm gonna have um, wonder child I'm gonna have um, I'm gonna have five coming at you**
>
> **LO: Five**
>
> **JL: Yeah, yeah, yeah they takin care of it now and shit they putting it together.  About to send UI**
>
> **LO: I can't hear you my man**
>
> **JL: They putting it together about to send it up, five**
>
> **LO: Alright**
>
> **JL: Yep**
>
> **LO: When morning**
>
> **JL: UI. I'm I'm not, no I'm not, I'm not, I'm not in town, but um, you, you know, you know bro, bro that be with me.**
>
> **LO: Yeah I know**
>
> **JL: Yeah UI**
>
> **LO: What time, is it gonna be in the morning**
>
> **JL: Yeah, it's gonna be in the morning, same time**

**LO: Wod**

**JL: UI**

**LO: Call me**

**JL: UI just say, I'm gonna call you, UI**

**LO: So what you gonna have, I'm listening go ahead**

**JL: UI, is it okay for me to give him your number, on his phone**

**LO: Give him this.  Give him this one, this the work one, but you**

**JL: Okay**

**LO: You call, you call my other one though you feel me**

**JL: Okay I got you**

**LO: And let me know when he's getting, so where I'm gonna meet him on the north or I'm gonna meet him somewhere else**

**JL: No, same spot, same spot, and shit every damn day**

**LO: That's cool, that's cool just call me, call me in the morning when he's getting close to the city, you feel me**

**JL: I got you**

**LO: No doubt man, see good look too yo**

**JL: I be back this weekend and shit, I mean I'll be back um, Friday, yeah this week**

**LO: UI you man I got you**

**JL: Alright bro**

**LO: Alright**

**JL: One**

20.    Your Affiant believes, based on my knowledge and experience, that in the above conversation LIPSCOMB informed OAKES that five hundred bricks of heroin were being prepared to be transported from the Newark area to Pittsburgh and would arrive the next morning. LIPSCOMB stated that they were "**putting it together**", believed to mean packaging and preparing the heroin for the courier to transport.  LIPSCOMB informed OAKES that the courier transporting the heroin would meet with OAKES at the same location, believed to be

LIPSCOMB's stash residence located at 1135 Buente Street, Pittsburgh, Pennsylvania. LIPSCOMB asked OAKES if LIPSCOMB could provide the courier with OAKES' telephone number. OAKES instructed LIPSCOMB to provide the courier with one of his telephones, and asked that LIPSCOMB contact OAKES over a different telephone when the courier was getting close to arriving in Pittsburgh.

21. Early the next morning, May 12th, at approximately 5:56 a.m., TARGET TELEPHONE 3 [412-218-9912], utilized by LIPSCOMB, made an outgoing telephone call to telephone number 908-922-3401, known to be utilized by MARCUS HARRIS, a drug courier for the LIPSCOMB DTO. Below is a transcription of the conversation between LIPSCOMB (JL) and HARRIS (MH):

> **MH: Yeah, yeah**
> **JL: Yeah, yeah**
> **MH: Yeah, I'm just bout, I'm just got to the station right now.  I'm bout to turn into this shit**
> **JL: A'ight, call 'em.  I'm a call bro now**

22. Your Affiant believes based on my knowledge and experience that in the above conversation, HARRIS informed LIPSCOMB that he was arriving in Pittsburgh. LIPSCOMB told HARRIS that he was going to call "**bro**", who your Affiant believes is OAKES, to inform OAKES that the heroin was arriving.

23. Pole camera surveillance footage captured HARRIS arriving at 1135 Buente Street by jitney before entering the stash residence with a large, black duffel bag. HARRIS exited the stash residence shortly before OAKES arrived in a rental vehicle and entered the stash residence. OAKES was observed exiting the stash residence with an olive green duffel bag, believed to contain approximately 500 bricks of heroin, before departing the area in his rental vehicle.

HARRIS also departed the area via the same jitney and returned to Newark via a Greyhound bus the same day.

**May 31 – June 1, 2016**

**24.**    On May 31, 2016, at approximately 1:25 p.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB, received an incoming telephone call from telephone number 609-787-1566, utilized by QADREE RICHARDSON, a/k/a "Qadree Christian", a/k/a "Shotty". Below is a transcription of the conversation that occurred between LIPSCOMB (JL) and RICHARDSON (QR):

**JL: Yo**
**QR: Yo yo yo what's up bro**
**JL: What's good man**
**QR: It ain't nothing man, they hey you aint' get a new work joint**
**JL: Awe damn, I got run UI**
**QR: Not yet**
**JL: Yeah, I gotta go get my work joint**
**QR: Alright, alright um**
**JL: I got the new one already, I got the old, I just gotta go get it.  I had put it up when I came up here**
**QR: Alright**
**JL: Remember I had got the new one**
**QR: What's up with Zack**
**JL: Um, shit I need him**
**QR: Tell him, tell him call me up.  Tell him call me up**
**JL: Alright**
**QR: You ready**
**JL: Yeah let me, let me bust a you**
**QR: You ready**
**JL: Yeah, let me, I'm a bust a you and got get ah, go to work real quick**

**QR: You heard, I got the, I got I got the joint**

**JL: Yeah yeah UI you heard**

**QR: Um what is, I don't know when you gave it to me**

**JL: Huh**

**QR: I don't remember you giving me the new joint**

**JL: Yeah, I got it like a week ago and I talked to you already, I got yours**

**QR: Alright**

**JL: Oh naw, naw, I ain't got yours**

**QR: Yeah that's what I was saying**

**JL: Yeah because you, you yeah yeah yeah yeah yeah yeah**

**QR: I just got a new joint**

**JL: Damn**

**QR: Hey but anyway, just tell Zack to call me up, see UI**

**JL: Alright**

**QR: UI**

**JL: Alright**

25.    Your Affiant believes, based on my knowledge and experience, that in the above conversation LIPSCOMB and RICHARDSON were discussing having new telephones on which to communicate about drugs, which they referred to as "**work joints**".  LIPSCOMB informed RICHARDSON that he had acquired a new telephone a week ago and did not have it on him. RICHARDSON said that he just obtained a new telephone.  RICHARDSON asked LIPSCOMB, "**you ready**", and LIPSCOMB responded by informing RICHARDSON "**I'm a bust a you and got get a, go to work real quick**", which your Affiant believes to mean that LIPSCOMB was informing RICHARDSON that he was going to obtain his other, new telephone and contact RICHARDSON to discuss further details of the heroin.  RICHARDSON asked LIPSCOMB "**what's up with Zack**", and LIPSCOMB responded, "**I need him**".  Your Affiant believes based on Title III wiretap interceptions, where HARRIS is referred to as both "Sozack" and "Zack", that

they are referring to MARCUS HARRIS who was being tasked with bringing heroin to Pittsburgh. RICHARDSON asked for LIPSCOMB to have "Zack" contact him, which your Affiant believes to be for RICHARDSON to provide the heroin to HARRIS so that he can transport it to LIPSCOMB in Pittsburgh.

26.    On May 31, 2016, at approximately 4:19 p.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB, received an incoming telephone call from telephone number 908-922-3401, utilized by MARCUS HARRIS.  During this LIPSCOMB asked HARRIS, "**when you gonna be in, tomorrow?**", and HARRIS responded with "**yeah, I'll be in the morning**". Towards the end of the conversation HARRIS asked, "**what's up with bro down there?**" LIPSCOMB informed HARRIS he is "**cool**" and that he was supposed to have "**got with him today he told me he was gonna call me when he get out of school, that nigga ain't called me yet**".

27.    Your Affiant believes, based on my knowledge and experience, that during the above conversation, HARRIS informed LIPSCOMB that he would be arriving in the Pittsburgh area in the morning.  Later in the conversation HARRIS asked about an unknown male, believed by your Affiant to be one of LIPSCOMB'S heroin customers.  LIPSCOMB stated that he was supposed to have "**got with him today**" and said that he was supposed to have called LIPSCOMB when he was out of school.

28.    On May 31, 2016, at approximately 8:09 p.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB, received an incoming telephone call from TARGET TELEPHONE 5 [412-668-6302], utilized by OAKES.  During this conversation LIPSCOMB informed OAKES that he was "**downtown**".  OAKES asked where and said that he could just "**come closer to you**".  LIPSCOMB said he was off the exit on Smithfield.  LIPSCOMB and

OAKES agreed to meet by the 7-Eleven store off of Smithfield Street.

**29.** Your Affiant believes based on my knowledge and experience in the above conversation that LIPSCOMB and OAKES were meeting so that OAKES could provide LIPSCOMB with money from the last heroin shipment in anticipation of a new shipment arriving.

**30.** On May 31, 2016, at approximately 9:57 p.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB, made an outgoing telephone call to telephone number 908-922-3401. During this conversation HARRIS informed LIPSCOMB, "**I'm in motion already**". Later in the call HARRIS was overheard telling LIPSCOMB "**my other number**". Your Affiant believes that HARRIS informed LIPSCOMB that he was on the bus and traveling to the Pittsburgh area to provide LIPSCOMB with the heroin. Your Affiant believes that HARRIS mentioned "**my other number**" to inform LIPSCOMB that he had another cellular telephone on him in the event LIPSCOMB needed additional details.

**31.** On June 1, 2016, at approximately 5:44 a.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB made an outgoing telephone call to telephone number 908-922-3401, utilized by MARCUS HARRIS. During this conversation LIPSCOMB and HARRIS discussed HARRIS' location. HARRIS informed LIPSCOMB "**I'm here but ah, but I didn't get off this highway yet**". LIPSCOMB instructed HARRIS to "**hit me when you get downtown**".

**32.** Your Affiant believes, based on my knowledge and experience, that in the above conversation, LIPSCOMB contacted HARRIS to see how close HARRIS was from the Pittsburgh Greyhound Terminal. HARRIS informed LIPSCOMB that he was in the Pittsburgh area but was still on the highway.

**33.** Approximately 16 minutes later, at 6:00 a.m., TARGET TELEPHONE 3 [412-620-3779], utilized by LIPSCOMB received an incoming telephone call from telephone number 908-

922-3401, utilized by HARRIS.  During this call HARRIS informed LIPSCOMB, "**I can't get that bag off the bus bro, they waiting for me to pick it up**".  HARRIS informed LIPSCOMB that the police asked if the bag belonged to HARRIS and said that he told the police it did not.  LIPSCOMB directed HARRIS to walk towards the convention center and said he was in a white car and would pick HARRIS up.

34.    Your Affiant believes based on my knowledge and experience that in the above conversation, HARRIS informed LIPSCOMB that there were police in the Pittsburgh Greyhound terminal who were conducting searches of the buses.  HARRIS informed LIPSCOMB that the police asked if the bag containing the heroin belonged to HARRIS, and that he told the police it did not.  Law enforcement were, in fact, conducting a drug interdiction on the bus as part of this investigation.  The bag HARRIS was seen boarding the bus with in Newark by surveillance there was abandoned by HARRIS when confronted by law enforcement upon the bus's arrival in Pittsburgh.

35.    Physical surveillance units positioned outside the Pittsburgh Greyhound terminal observed HARRIS exit the terminal and walk towards the convention center.  HARRIS was picked up by a white Chevrolet Impala, driven by LIPSCOMB.

36.    Subsequent to a search of the abandoned bag located on the Greyhound bus near HARRIS, law enforcement recovered approximately 400 bricks of heroin which contained the markings "Ferrari" and "Goodnights".  Also discovered inside the duffel bag were several bags which contained a red/brown rock like substance, determined by the Allegheny County Lab to be Bath Salts.  The narcotics were weighed and placed into FBI evidence.  The heroin had a gross weight (which includes the weight of the packaging) of 1,673.1 grams.

37.    LIPSCOMB utilized several different telephones throughout the investigation to

maintain and orchestrate his heroin trafficking business. Specifically, and corroborated through the above court authorized interceptions, LIPSCOMB utilized TARGET TELEPHONE 3 [412-620-3779] as an "everyday phone", meaning LIPSCOMB utilized this telephone to contact trusted individuals such as his wife, MACHELL LIPSCOMB. However, LIPSCOMB also utilized TARGET TELEPHONE 3 [412-620-3779] to maintain contact with certain co-conspirators, like OAKES.

38.    TELEPHONE 8 [862-233-3827] was utilized by LIPSCOMB to maintain contact with his co-conspirators to conduct more detailed conversations regarding the acquisition, processing, transportation, and distribution of heroin. LIPSCOMB also spoke with OAKES over TELEPHONE 8 [862-233-3827], but in a manner in which the TARGET SUBJECTS felt more comfortable discussing specific details of the heroin conspiracy, such as arrival dates of heroin shipments and amounts. Also, LIPSCOMB only utilized TARGET TELEPHONE 4 [412-719-1073], and then TELEPHONE 8 [862-233-3827], to maintain contact with ORTIZ, known to be LIPSCOMB's out-of-state source of heroin supply.

39.    The telephones used by these TARGET SUBJECTS were replaced by new telephones on a regular basis. This is known to be a common tactic utilized by individuals involved in illegal activities in an attempt to elude law enforcement detection. The interceptions over the TARGET TELEPHONES have assisted agents in gathering essential evidence regarding multiple aspects of the activities performed and developed by the LIPSCOMB DTO.

40.    On July 6, 2016, a federal search warrant was executed at LIPSCOMB's primary residence, where he was taken into custody. A search of the premises produced over $110,000 in United States currency, hundreds of empty heroin stamp bags bearing stamps "Punk You" and "Pandamonium", multiple cellular telephones, and other items that were seized or captured in

photographic images.

41.　A search incident to the arrest of LIPSCOMB produced Phone #1 (FCC ID: A3LSMB311V) in his pants pocket. The phone was subsequently seized as evidence. A systematic search of LIPSCOMB's primary residence produced Phone #2 (FCC ID: BCGA1303B), which was discovered in a safe located in a storage room containing large amounts of merchandise, to include men's and woman's shoes, bags, televisions, and game consoles. The safe was opened and produced indicia for both LIPSCOMB and his wife MACHELL. Phone #2, which had a cracked screen, was seized as evidence. A search of LIPSCOMB's bedroom produced Phone #3 (FCC ID: BCG-E2944A) on top of a dresser. The phone was seized as evidence. A search of the kitchen in LIPSCOMB's primary residence produced Phone #4 (SN: 364TFG65D2) and Phone #5 (HEX ID: A00 39A 2A5 1B) in a cabinet drawer. Since the kitchen was considered a common area, both phones were seized as evidence.

42.　On August 2, 2016, a Grand Jury sitting in the Western District of Pennsylvania indicted LIPSCOMB, OAKES, ORTIZ, HARRIS, and SCOTT BOWRA, a co-conspirator, on federal drug charges, including conspiracy to possess with the intent to distribute and distribute heroin.

43.　For the reasons set forth above, your Affiant has probable cause to believe that LIPSCOMB is involved in illegal drug activities. Based on my knowledge and experience individuals involved in said illegal activities will utilize multiple cellular devices, i.e. **Phone #1** (FCC ID: A3LSMB311V)**, Phone #2** (FCC ID: BCGA1303B)**, Phone #3** (FCC ID: BCG-E2944A)**, Phone #4** (SN: 364TFG65D2)**,** and **Phone #5** (HEX ID: A00 39A 2A5 1B), to store: photographs, videos, text messages or similar messages such as SMS or IM, voice messages, calendar information, telephone numbers (including the number of the phone itself), names,

nicknames, indicia of ownership and/or use, and/or other contact or identification data of co-conspirators, customers, and financial institutions, contained within the cellular telephone, call logs and/or call settings relating to the distribution of controlled substances, and other information and data detailed in Attachment B of this Affidavit. All of this data could be evidence of LIPSCOMB's illegal activities. Additionally, drug traffickers are also known to retain these cellular devices in their homes or other locations due to the incriminating evidence that exists on them.

44.     Thus, information contained within **Phone #1** (FCC ID: A3LSMB311V), **Phone #2** (FCC ID: BCGA1303B), **Phone #3** (FCC ID: BCG-E2944A), **Phone #4** (SN: 364TFG65D2), and **Phone #5** (HEX ID: A00 39A 2A5 1B) will most likely provide further evidence in regards to the illegal activities of LIPSCOMB and other members of the LIPSCOMB DTO concerning violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(i) and 846, i.e. conspiring together with others to possess with the intent to distribute and distribute heroin.

Andrew F. Siebert
Special Agent
Federal Bureau of Investigation


Sworn to before me this

_6th_ day of October, 2016.

LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE
Western District of Pennsylvania

**ATTACHMENT A**

1.      This warrant authorizes the Federal Bureau of Investigation to search the following

Devices:

        **a.)**     Black Verizon Samsung, "Flip Style" Cellular Phone Bearing FCC ID:

                  A3LSMB311V ("Phone #1")

        **b.)**     Black iPhone, "Touch Screen" Cellular Phone Bearing FCC ID: BCGA1303B

                  ("Phone #2")

        **c.)**     Black and silver iPhone, "Touch Screen" Cellular Phone Bearing FCC ID:

                  BCG-E2944A ("Phone #3")

        **d.)**     Black Motorola Nextel, "Flip Style" Cellular Phone Bearing Serial

                  #364TFG65D2 ("Phone #4")

        **e.)**     Silver Samsung Cellular Phone Bearing Hex ID: A00 39A 2A5 1B ("Phone

                  #5")

2.      These Devices, which were seized from JAMES LIPSCOMB during a search incident to his arrest and a federal search warrant at his primary residence located at 79 Hillcrest Drive, Pittsburgh, PA 15237, are currently located at the Pittsburgh Office of the Federal Bureau of Investigation.  This warrant authorizes the search and forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records and items on the Devices described in Attachment A, including:

    a.  Text messages or similar messages such as SMS or IM, saved messages, deleted messages, draft messages, call logs, all phone settings (i.e. call, messaging, display), priority senders, photographs, videos, links, account information, voicemails and all other voice recordings and commands, contact and group lists, and favorites;

    b.  Pictures, all files, cloud files and relevant data without password access, storage information, documents, videos, programs, calendar information, notes, memos, word documents, PowerPoint documents, Excel Spreadsheets, and date and time data;

    c.  Payment information, to include account numbers, names, addresses, methods of payment, amounts, additional contact information, and financial institutions;

    d.  Lists and telephone numbers (including the number of the phone itself), names, nicknames, indicia of ownership and/or use, and/or other contact and/or identifying data of customers, co-conspirators, and financial institutions;

    e.  Applications (Apps) without password access, to include subscriber information, provider information, login information, contact and group lists, favorites, history, deleted items, saved items, downloads, logs, photographs, videos, links, other identifying information, and any additional information indicative of drug trafficking, gang activity, or other criminal violations;

    f.  Social media sites without password access to include, name and provider information of social media network(s), profile name(s), addresses, contact and group lists (i.e. friends, associates, etc.), photographs, videos, links, favorites,

likes, biographical information (i.e. date of birth) displayed on individual page(s), telephone numbers, email addresses, notes, memos, word documents, downloads, status, translations, shared information, GPS, mapping, and other information that provides location and geographical data, blogs, posts, updates, messages, emails, and any additional information indicative of drug trafficking, gang activity, or other criminal violations;

g. Types, amounts, prices, and methods of drugs trafficked and/or distributed as well as individuals involved, dates, places, and amounts of specific transactions;

h. Any information related to sources of supply and distribution of drugs (including names, addresses, telephone numbers, or any other identifying information);

i. Travel log records from GPS data (i.e. Google Maps and/or other Apps), recent history, favorites, saved locations and/or routes, settings, account information, calendar information, and dropped pinpoint information;

j. Internet service provider information, accounts, notifications, catalogs, Wi-Fi information, search history, bookmarks, favorites, recent tabs, deleted items and/or files, downloads, purchase history, photographs, videos, links, calendar information, settings, home page information, shared history and/or information, printed history and/or information, location data, and any additional information indicative of drug trafficking, gang activity, or other criminal violations;

k. Email data to include, email addresses, IP addresses, DNS provider information, telecommunication service provider information, subscriber information, email provider information, logs, drafts, downloads, inbox mail, sent mail, outbox mail, trash mail, junk mail, contact lists, group lists, attachments and links, and any

additional information indicative of drug trafficking, gang activity, or other criminal violations;

l.     Any additional information regarding drug trafficking, distribution, proceeds or other criminal violations.

2.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any video, photographic, or documented form.

3.     All of the above items constitute evidence of violations of Title 21, United States Code, Sections 841(a)(i), 841(b)(1)(B)(i), 843(b), and 846 (distribution and/or possession with intent to distribute heroin; use of a communication facility to further the commission of a felony controlled substance offense; and/or conspiracy to distribute heroin).